# No. 25-5495

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

In re DIAVION DE NIRO, individually and on behalf of all others similarly situated,

*Petitioner*,

v.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA,

*Respondent*,

and

ARISE VIRTUAL SOLUTIONS, INC.,

*Real Party in Interest.*

**On Petition for a Writ of Mandamus to the United States District Court for the District of Nevada (No. 2:24-cv-00695-APG-EJY)**

**PETITIONER'S MOTION FOR JUDICIAL NOTICE**

Shannon Liss-Riordan
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston St., Suite 2000
Boston, MA 02116
(617) 994-5800
sliss@llrlaw.com

*Counsel for Petitioner*

## I.  INTRODUCTION

Pursuant to Federal Rule of Evidence 201, Federal Rule of Appellate Procedure 27, and Circuit Rule 27-1, Petitioner respectfully moves this Court to take judicial notice of five federal court filings, as described below and attached hereto. These federal court filings are appropriate subjects for judicial notice because they are "undisputed matters of public record . . . on file in federal . . . courts." *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012). Accordingly, Petitioner respectfully requests that this Motion be granted.

## II.  ARGUMENT

Under Federal Rule of Evidence 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." This Court has also specifically held that it "may take judicial notice of undisputed matters of public record, . . . including documents on file in federal or state courts." *Harris*, 682 F.3d at 1132 (citing *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002)).

Indeed, this Court has routinely held that judicial notice of federal court filings is proper. *See, e.g.*, *In re Burris*, 713 F. App'x 597, 598 (9th Cir. 2018) ("The district court did not abuse its discretion in granting defendants' requests for

1

judicial notice because the documents in question were either filed in federal court, or matters of public record."); *Ransom v. Sandoval*, 53 F. App'x 803, 803 n.1 (9th Cir. 2002) ("This court takes notice of the proposed fourth amended complaint and documents filed in other state and federal courts . . . ."); *Dorise v. Matevousian*, 692 F. App'x 864, 866 n.1 (9th Cir. 2017) (granting motion for judicial notice of federal court records); *McCann v. Taleff*, 828 F. App'x 461, 462 (9th Cir. 2020) ("The district court properly took judicial notice of the previous lawsuits in state and federal court.").

Exhibits D and E attached to this Motion, as noted below, contain arbitration awards. Since these awards were filed publicly in federal actions, they are proper subjects of judicial review based on the authorities cited above. Moreover, courts within this Circuit have repeatedly held that an arbitration award is a proper subject of judicial notice. *See, e.g.*, *Kurtcu v. U.S. Parking Inc.*, 2008 WL 2445080, at *2 (N.D. Cal. June 16, 2008); *Flynn v. Credit Acceptance Corp.*, 2023 WL 6150273, at *1 n.1 (C.D. Cal. Aug. 21, 2023); *EXA-USA, Corp. v. Farnese Terra, Inc.*, 2023 WL 2772515, at *3 (N.D. Cal. Mar. 16, 2023); *Chandler v. State Bar of Cal.*, 2008 WL 901865, at *1 (N.D. Cal. Mar. 31, 2008); *Rowland v. Prudential Fin., Inc.*, 2007 WL 1893630, at *1 n.1 (D. Ariz. July 2, 2007); *Klahn v. Quizmark, LLC*, 2013 WL 4605873, at *1 n.4 (N.D. Cal. Aug. 28, 2013); *Allstate Ins. v. Brown*,

2012 WL 12896219, at *1 n.3 (C.D. Cal. Dec. 14, 2012); *Bucur v. FedEx Ground Package Sys. Inc.*, 2015 WL 13285090, at *1 n.2 (C.D. Cal. Sept. 10, 2015).

Here, Petitioner requests that the Court take judicial notice of the following federal court filings cited in its Petition for a Writ of Mandamus, filed concurrently with this Motion:

- Order on Motion to Compel Arbitration, *Otis v. Arise Virtual Sols., Inc.*, No. 0:12-cv-62143-KMW (S.D. Fla. Aug. 5, 2013), Dkt. No. 41, attached as **Exhibit A**.

- Order, *Steele v. Arise Virtual Sols., Inc.*, No. 0:13-cv-62823-WJZ (S.D. Fla. Aug. 11, 2015), Dkt. No. 63, attached as **Exhibit B**.

- Notification of Docket Entry, *Carter v. Arise Virtual Sols, Inc.*, No. 1:16-cv-06262 (N.D. Ill. June 19, 2018), Dkt. No. 72, attached as **Exhibit C**.

- Plaintiff's Motion for Reconsideration of Order Compelling Arbitration Exhibit D (Arbitrator's Interim Award), *Steele v. Arise Virtual Sols., Inc.*, No. 0:13-cv-62823-WJZ (S.D. Fla. May 4, 2015), Dkt. No. 58-4, attached as **Exhibit D**.

- Plaintiff's Motion for Reconsideration of Order Compelling Arbitration Exhibit E (Interim Award), *Steele v. Arise Virtual Sols.*,

3

*Inc.*, No. 0:13-cv-62823-WJZ (S.D. Fla. May 4, 2015), Dkt. No. 58-5,

attached as **Exhibit E**.

## III.    CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that this Court

grant this Motion for Judicial Notice.

Dated: August 28, 2025                 Respectfully Submitted,

                                       /s/ Shannon Liss-Riordan
                                       Shannon Liss-Riordan
                                       LICHTEN & LISS-RIORDAN, P.C.
                                       729 Boylston Street, Suite 2000
                                       Boston, MA 02116
                                       (617) 994-5800
                                       sliss@llrlaw.com


                                       *Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I certify that on August 29, 2025, I electronically filed the foregoing Motion

with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit

using the ACMS system. On August 28, 2025, I also caused the Motion to be

served by mail and email on the following recipients:

Adam P. KohSweeney
Katy (Yin Yee) Ho
O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
akohsweeney@omm.com
kho@omm.com
(415) 984-8700

Dora V. Lane
Ascent Law, PC
5470 Kietzke Lane, Suite 300
Reno, NV 89511
dora@ascent-employmentlaw.com
(775) 671-6171


Dated: August 29, 2025             Respectfully Submitted,

                                   /s/ Shannon Liss-Riordan
                                   Shannon Liss-Riordan

                                   *Attorney for Petitioner*

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 12-62143-CIV-WILLIAMS**

JOSEPH OTIS, TRACEY CUPP,
AYUB ADBUL-HAQQ, AND TAMI
PENDERGRAFT, individually and on
behalf of themselves and all others
similarly situated,

      Plaintiff,

vs.

ARISE VIRTUAL SOLUTIONS, INC.,
      Defendant.

_____/

## ORDER ON MOTION TO COMPEL ARBITRATION

**THIS MATTER** is before the Court on Defendant Arise Virtual Solutions, Inc.'s

("Arise") Motion to Compel Arbitration and Stay Proceedings [D.E. 26].  For the reasons

stated below, the motion is **GRANTED** as to all Plaintiffs.

### I.    BACKGROUND

On March 13, 2013, Plaintiffs filed their First Amended Class Action Complaint

("Complaint") against Defendant Arise and on behalf of "Customer Support

Professionals" ("CSP's") who have worked for Arise.  [D.E. 21 at 1].  Plaintiffs assert

that by misclassifying employees as Independent Business Owners or agents of

Independent Business Owners, Defendant has failed to "pay [employees] minimum

wage for all time worked," and required its employees "to pay various expenses that

should have been borne by the employer." [*Id.*].  Plaintiffs allege that in doing so,

Defendant "violated the federal Fair Labor Standards Act ('FLSA'), 29 U.S.C. §§ 201 *et*

*seq.,* the Florida Minimum Wage Act, Florida Statute § 448.110 and § 24 Art. X of the

Florida Constitution." [*Id.*].

Defendant filed its Motion to Compel Arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, on April 4, 2013. [D.E. 26]. Defendant states that all Plaintiffs are principal owners of businesses, or were engaged as a CSP by other businesses that "contracted with Arise to provide customer support and other services on a project for an Arise client." [*Id.* at 1]. Defendant asserts that the businesses "agreed to provide these services as independent contractors of Arise and to be solely responsible for providing employment compensation and benefits to all of the persons they engaged to provide these services on their behalf, specifically including Plaintiffs." [*Id.* at 1, 2]. Defendant also asserts that all Plaintiffs entered into valid arbitration agreements with Defendant. [*Id.* at 2]. Defendant requests the Court to enforce those arbitration agreements and compel arbitration. [*Id.*]

Plaintiffs filed their Opposition to Defendant's Motion to Compel Arbitration on April 18, 2013. [D.E. 34]. Plaintiffs assert that Plaintiff Tami Pendergraft and two other opt-in plaintiffs do not recall or have a record of entering into an arbitration agreement with Defendant. [*Id.* at 8-10]. Plaintiffs also argue that the Court should refuse to compel arbitration because the agreements between Plaintiffs and Defendant contain class action waivers. [*Id.* at 15, 16, 17]. Defendant filed a Reply to Plaintiff's Opposition on April 29, 2013. [D.E. 35].

## II.     STANDARD

The intent of the FAA is to ensure "the enforceability of contractual arbitration provisions." *Weaver v. Fla. Power & Light Co.*, 172 F.3d 771, 774 (11th Cir. 1999). Under the provisions of chapter 1 of the FAA, a court shall compel arbitration once it determines that certain statutory requirements are met. 9 U.S.C. § 4; *see also Miller v.*

2

*Drexel Burnham Lambert, Inc.*, 791 F.2d 850, 854 (11th Cir. 1986). First, a court must determine if there is a valid agreement to arbitrate. *Id.* The FAA states that a clause in any contract "evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract" will be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C § 2.

A court must also determine whether Plaintiff's claims fall within the scope of the arbitration agreement. *Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). If these requirements are met, the FAA requires the Court to compel arbitration. 9 U.S.C. § 4 ("[T]he court ***shall*** make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.") (emphasis added).

## III.   LEGAL ANALYSIS

### A.   Enforceability of Arbitration Agreements of Plaintiffs Otis, Cupp and Abdul-Haqq

Plaintiffs Otis, Cupp and Abdul-Haqq are Independent Business Owners that contracted to provide customer support services to Defendant. [D.E. 26 at 1-2]. In its motion, Defendant asserts that Plaintiffs Otis, Cupp and Abdul-Haqq each entered into arbitration agreements with Arise when Plaintiffs signed "Master Services Agreements ("MSAs") and Statements of Work ("SOWs"). [D.E. 26 at 6]. The SOWs contain arbitration agreements that provide:

> Arise and [Plaintiff's Corporation], on behalf of itself and all of Company's Designated CSPs . . . , hereby agree to resolve any and all disputes or claims each may have against the other by binding arbitration…

3

>...By signing this SOW, all parties waive their right to
>commence, to become a party to, or to remain a participant
>in, any group, representative, class, collective, or hybrid
>class/collective action in any court against one or more other
>parties to this SOW. Further, the parties waive their right to
>commence, to become a party to, or to remain a participant
>in, any group, representative, class, collective, or hybrid
>class/collective action claim in arbitration or any other forum.
>The parties agree that any claim by or against any other
>party to this SOW or any Arise Client shall be heard without
>consolidation of such claim with any other person or entity's
>claim...

(Joseph Otis' SOWs, [D.E.27-3 ¶ 13]; [D.E. 27-4 ¶ 12]); (Tracey Cupp's SOWs, [D.E.

27-6 ¶ 13]; [D.E. 27-7 ¶ 13]); (Ayub Adbul-Haqq's SOWs, [D.E. 27-9 ¶ 13]; [D.E. 27-10 ¶

13]). The signed MSAs contain similar arbitration provisions. (Joseph Otis' MSA, [D.E.

27-2 § 10]); (Tracey Cupp's MSA, [D.E. 27-5 § 10]); (Ayub Abdul Haqq's MSA, [D.E. 8 §

10]). The Independent Business Owner Plaintiffs do not deny that they signed these

arbitration agreements, nor that these broad arbitration agreements encompass their

claims. [D.E. 34]. Therefore, the Court finds that Plaintiffs Joseph Otis, Tracey Cupp,

and Ayub Abdul Haqq have entered into valid and enforceable arbitration agreements

with Defendant and their claims fall within the scope of these agreements.

**B.     Enforceability of Arbitration Agreement of Plaintiff Tami
Pendergraft**

Plaintiff Tami Pendergraft is in a different position than the other three named

Plaintiffs, because she was not an independent business owner. [D.E. 26 at 5]. Rather,

Pendergraft was an employee of Lumbu, Inc. ("Lumbu"), a company providing services

to Defendant. [Id.]. Defendant asserts that Pendergraft, as a CSP affiliate of Lumbu,

individually and electronically signed an Acknowledgment and Waiver Agreement,

4

("Agreement")[1], in which Pendergraft agreed to "resolve any disputes with Arise through binding arbitration and waive her right to pursue class or collective actions." [*Id.*]. The Agreement states:

> Company and Client Support Professional hereby agree to resolve any and all disputes or claims each may have against the other, and Client Support Professional hereby agrees to resolve any and all disputes that he or she may have against Arise or any client of Arise…by binding arbitration…
>
> By signing this Agreement, all parties waive their right to commence, to become a party to, or to remain a participant in, any group, representative, class, collective, or hybrid class/collective action in any court against one or more of the parties to this Agreement, Arise or any client of Arise.

[D.E. 31-1 § 7, 10]. Thus, Defendant argues that because the Agreement is valid and enforceable, the Court should compel arbitration. [D.E. 8, 10].

Pendergraft contends that she has no memory of signing the Agreement or any other document that contained an arbitration clause and claims that the Agreement is invalid. [D.E. 34-1 ¶¶ 4, 5]. Furthermore, Pendergraft challenges the authenticity and validity of the electronic signature found on the Agreement, stating that Defendant has offered no evidence that Pendergraft consented to the use of an electronic signature. [D.E. 34 at 8].

"The party seeking to avoid arbitration must unequivocally deny that an agreement to arbitrate was reached and must offer 'some evidence' to substantiate the denial." *Brueggemann v. NCOA Select, Inc.*, No. 08-80606-Civ, 2009 WL 1873651, at *2 (S.D. Fla. Jun. 30, 2009) (citing *Wheat, First Securities, Inc. v. Green*, 993 F.2d 814,

---

[1] Lumbu and Pendergraft are parties to this Agreement. Defendant Arise is named as a third party beneficiary to the Agreement.

817 (11th Cir. 1993)). A party cannot place the making of an arbitration agreement in issue merely by denying that an agreement exists, but must substantiate the denial with enough evidence to make the denial colorable. *See Williams v. MetroPCS Wireless, Inc.*, No. 09-22890-Civ, 2010 WL 62605, at *8 (S.D. Fla. Jan. 05, 2010) (citing *Chastain v. Robinson-Humphrey Co., Inc.*, 957 F.2d 851, 855 (11th Cir. 1992)).

Aside from Pendergraft's lack of recollection, Plaintiffs fail to offer any evidence to substantiate Pendergraft's denial that an agreement to arbitrate was reached. The Agreement provides a Signature ID number, lists Pendergraft as the signer and displays Pendergraft's email address.[2] [D.E. 31-1 at 3]. Additionally, Plaintiffs have not given the Court any reason to question whether Defendant had adequate electronic security procedures. Consequently, Pendergraft's lack of recollection, on its own, does not sufficiently substantiate her denial that an agreement to arbitrate was reached.[3]

Finally, Plaintiffs assert that because Defendant did not obtain Pendergraft's consent to use an electronic signature, the electronic signature on the Agreement is invalid. [D.E. 34 at 8]. However, Plaintiffs fail to cite any authority that supports the dubious proposition that one must consent to the use of an electronic signature in order to sign an electronic contract. A signature or contract "may not be denied legal effect, validity, or enforceability solely because it is in electronic form." 15 U.S.C. § 7001(a)(1); *see also* Fla. Stat. § 668.004 ("Unless otherwise provided by law, an electronic

---

[2] Plaintiffs do not deny that the email address listed in the Agreement is Pendergraft's email address.

[3] The Court questions whether Pendergraft's lack of recollection constitutes an unequivocal denial that an agreement was reached. Plaintiff has not cited any authority that suggests a lack of recollection is, on its own, sufficient to dispute the validity of a signature or contract.

signature may be used to sign a writing and shall have the same force and effect as a written signature."). Accordingly, Plaintiffs' argument is unavailing.

For the Court to compel arbitration, the FAA also requires that a plaintiff's claims fall within the scope of the arbitration agreement. *See Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Pendergraft does not refute Defendant's assertion that the claims fall within the scope of the Dispute Resolution Agreement. [D.E. 34]. The Agreements reads in pertinent part, "Client Support Professional hereby agrees to resolve ***any and all disputes that he or she may have against Arise*** or any client of Arise…by binding arbitration…" [D.E. 31-1 § 7] (emphasis added). Accordingly, the Court finds that Pendergraft's claims are within the scope of this broad arbitration agreement. In sum, Pendergraft entered into a valid arbitration agreement with Defendant and Pendergraft's claims are within the scope of the arbitration agreement.[4]

### C. Class Action Waivers

Each of the arbitration agreements between Plaintiffs and Defendant contains a class action waiver, which Plaintiffs contend render the arbitration agreements unenforceable. [D.E. 34 at 15-17]. However, "[t]he FAA's overarching purpose is to ensure the enforcement of arbitration agreements according to their terms." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1743 (2011). Courts in this Circuit have regularly enforced arbitration agreements that contain class action waivers. *See, e.g., Jenkins v. First. Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 877-78 (11th Cir. 2005);

[4] Opt-in plaintiffs Amanda Barton and Heather Steele also deny having any memory of entering into arbitration agreements with Arise. Plaintiffs' arguments regarding these opt-in plaintiffs are irrelevant because the opt-in plaintiffs are not named parties in this suit. Nevertheless, the Court finds their arguments equally unavailing.

7

*Randolph v. Green Tree Fin. Corp.—Alabama*, 244 F.3d 814, 819 (11th Cir. 2001); *La Torre v. BFS Retail & Commercial Operations, LLC*, No. 08-22046-CIV, 2008 WL 5156301, at *5 (S.D. Fla. Dec. 08, 2008); *see also McKenzie Check Advance of Florida, LLC v. Betts*, 112 So.3d 1176, 1188 (Fla. 2013). Consequently, the class action waivers do not undermine the enforceability of the arbitration agreements between Plaintiffs and Defendant.

## IV. Conclusion

Plaintiffs entered into valid and enforceable arbitration agreements with Defendant, and their claims in this case fall within the scope of those agreements. Therefore, pursuant to 9 U.S.C. § 4, the Court is obligated to compel arbitration as to all Plaintiffs. Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

(i)   Defendant's Motion to Compel Arbitration [D.E. 26] is **GRANTED**. Plaintiffs are hereby ordered to submit to arbitration in accordance with the terms of their respective agreements.

(ii)  Judicial proceedings in this matter are **STAYED**. The parties are ordered to notify the Court within 72 hours of the issuance of any final arbitration award as to each Plaintiff, or any settlement that resolves the issues in this case.

(iii) Despite the fact that the named Plaintiffs' claims are subject to arbitration, Plaintiffs argue that the Court should allow notice to issue to potential class members. [D.E. 34 at 11]. However, arbitrability is a threshold issue, and as a result of the Court's decision, there are no named Plaintiffs that can maintain this suit on behalf of themselves and other "employees" similarly

situated.  *See* 29 U.S.C. § 216(b).  Consequently, the Motion to Facilitate Notice to Potential Plaintiffs [D.E. 22] is **DENIED AS MOOT**.

(iv)    The Clerk is directed to **CLOSE** this case for administrative purposes.

**DONE AND ORDERED** in Chambers in Miami, Florida, this ___ day of August, 2013.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-62823-CIV-ZLOCH

HEATHER STEELE, individually
and on behalf of others
similarly situated,

       Plaintiff,

vs.                                        **O R D E R**

ARISE VIRTUAL SOLUTIONS, INC.,

       Defendant.
_____/

    THIS MATTER is before the Court upon Plaintiff's Motion To
Dismiss All Pending Claims Or In Alternative To Certify Order For
Interlocutory Appeal (DE 52) and Plaintiff's Motion For
Reconsideration Of Order Compelling Arbitration (DE 58). The Court
has carefully reviewed said Motions, the entire court file and is
otherwise fully advised in the premises.

    Accordingly, after due consideration, it is

    **ORDERED AND ADJUDGED** as follows:

    1. Plaintiff's Motion To Dismiss All Pending Claims Or In
Alternative To Certify Order For Interlocutory Appeal (DE 52) be
and the same is hereby **DENIED** pursuant to the Court's Order
Compelling Arbitration And Staying Action (DE 51); and

    2. Plaintiff's Motion For Reconsideration Of Order Compelling

Arbitration (DE 58) be and the same is hereby **DENIED**.

   **DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward

County, Florida, this ____11th____ day of August, 2015.


                                   _____
                                   WILLIAM J. ZLOCH
                                   United States District Judge

Copies Furnished:

All Counsel of Record

Douglas J. Mincher, Clerk of Court
The Eleventh Circuit Court of Appeals
56 Forsyth Street, N.W.
Atlanta, GA 30303

2

# EXHIBIT C

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.2.2
### Eastern Division

Barry Carter

                    Plaintiff,

v.                                       Case No.: 1:16−cv−06262

                                       Honorable Sara L. Ellis

Arise Virtual Solutions, Inc.

                    Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, June 19, 2018:

      MINUTE entry before the Honorable Sara L. Ellis: Pursuant to joint stipulation [71] this action is stayed pending individual arbitration. Status hearing set for 6/20/2018 is stricken and reset for 10/23/2018 at 9:30 AM. Mailed notice(rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# EXHIBIT D

## AMERICAN ARBITRATION ASSOCIATION

### AAA NO. 71-160-00563-13

| | |
|---|---|
| **TAMI PENDERGRAFT,** | § |
| | § |
| **Claimant,** | § |
| | § |
| **v.** | § |
| | § |
| **ARISE VIRTUAL SOLUTIONS INC.,** | § |
| | § |
| **Respondent.** | § |

---

### ARBITRATOR'S INTERIM AWARD

---

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Arise–Virtual Services Master Agreement between Lumbu Incorporated and Arise Virtual Solutions Inc., dated January 10, 2012, and having been duly sworn and having duly heard the allegations and proof submitted by the parties, AWARD, as follows:

### INTRODUCTION

After filing suit in federal court and being compelled to individual arbitration, Claimant Tami Pendergraft made a demand for arbitration against Respondent Arise Virtual Solutions Inc., before the American Arbitration Association on October 3, 2013. Her claim challenges Arise's wage payment and invoked the protections of the Fair Labor Standards Act ("FLSA"). On November 13, 2013, Arise filed its answering statement and counterclaim seeking to recover as unjust enrichment the compensation paid to Ms. Pendergraft pursuant to her servicing of an Arise customer through a third-party vendor. Ms. Pendergraft answered the counterclaim on November 27, 2013.

Case: 25-5495, 08/29/2025, DktEntry: 6.1, Page 24 of 69

On January 23, 2014, the American Arbitration Association confirmed the appointment of Deborah G. Hankinson to serve as the arbitrator. The arbitration proceedings were conducted according to the American Arbitration Association's Employment Arbitration Rules,

During the course of the arbitration proceedings, the parties further specified their claims to identify the amount each sought to recover and the other relief sought, and each party responded to the specifications. After conducting discovery, the parties filed pre-hearing briefs.

The arbitration hearing began on September 29, 2014. For two days, the parties presented witness testimony, documentary evidence, and the argument of counsel. At the conclusion of the hearing, the parties agreed to a post-hearing briefing schedule and to defer the attorneys' fees submission schedule until after the issuance of an interim award on the merits of their other claims and counterclaims and their respective defenses. The parties filed post-hearing briefs on November 25, 2014. Consistent with the parties' agreement, the arbitration proceedings have not closed, have remained open, and will remain open after the issuance of this Interim Award.

Having considered all the evidence, the applicable law, and the arguments of counsel, the Arbitrator issues this Interim Award that Claimant Tami Pendergraft recover $11,683.64 from Respondent Arise Virtual Solutions Inc., and that the parties submit either their evidence and briefing relevant to Ms. Pendergraft's claim for attorney's fees, or alternatively, their stipulation relevant to the amount of attorney's fees and costs to be awarded to Claimant Tami Pendergraft.

### FINDINGS OF FACT

1.      Arise advertises itself as "the pioneer of the virtual call centre industry." (Claimant's Ex. 3, at "Arise International"). Its business model is based upon providing its clients, which are large companies such as AT&T, Carnival Cruise Lines, and Barnes & Noble, with a customer-service workforce that Arise has labeled Client Support Professionals or

Case: 25-5495 08/29/2025 DktEntry: 6.1 Page 25 of 69

"CSPs." To provide this service, Arise has invested in software and other infrastructure that allows "third-party vendors" who "do not have the resource stream to support purchasing the infrastructure" necessary to provide call-center services to purchase access to Arise's infrastructure and in turn to provide call-center services to Arise's customers. (*Id.* at "Customer Contact Solutions"). Arise explains that it "save[s] [its] clients millions of dollars in up-front recruiting and training delivery expenses because Arise and its [CSPs] absorb the certification costs, eliminating the salaries for instructors and payments for those being certified." *Id.* Arise also reduces costs for clients by not paying CSPs for "any unproductive periods, such as call-wait time, breaks, lunch or vacation time, or most certification time." (*Id.*)

2.    Ms. Pendergraft worked out of her home to provide customer support to Arise's clients. Arise does not label CSPs like Ms. Pendergraft as employees of its company, but instead classifies them as independent contractors or employees of third-party vendors known as "IBOs" (Independent Business Owners). To work for Arise, CSPs must either form their own corporation to become an IBO or work as a CSP for someone else's IBO.

3.    Ms. Pendergraft did not have any call-center or customer-service experience similar to the work at Arise before working as a CSP, and she did not work for any other business (as either an employee or an independent contractor) during the time she worked at Arise. She first heard about Arise through a friend who knew that she was looking to work from home following a back injury. Ms. Pendergraft's friend put her in touch with Mari Lumbu, who worked for Arise as an IBO. With full understanding that Arise does not contract with individuals and that "you have to be an independent business contractor," Ms. Pendergraft chose not to form her own IBO and instead contacted Ms. Lumbu after receiving Ms. Lumbu's contact information from her friend. Ms. Pendergraft expected to enter into a long-term employment

relationship with Arise and understood that Ms. Lumbu was merely a pass-through whose IBO number would enable her to work for Arise.

4.      Before coming in contact with Ms. Pendergraft, Lumbu Incorporated had been established as an IBO, duly incorporated in the state of Texas by Mari Lumbu, and had retained other individuals to provide services on its behalf. Lumbu Incorporated signed a Master Services Agreement ("MSA") with Arise, effective January 10, 2012, to provide services on various customer-service projects as an independent contractor of Arise.

5.      Lumbu Incorporated and Ms. Pendergraft entered into their own written agreement. In an e-mail dated July 16, 2012, Ms. Pendergraft agreed to a contract with Lumbu Incorporated that required Ms. Pendergraft to provide a minimum number of hours of servicing and comply with a set of service-level requirements. The agreement also indicated that Lumbu Incorporated would withhold a 9.7% service fee from the base-rate calculation provided in the agreement. Agreements like these are entirely up to the discretion of the IBO, as are its relationship with its CSPs, and Arise played no part in any of these discussions. This is consistent with the MSA, in which Lumbu Incorporated represented to Arise that it would be solely responsible for providing employment compensation and benefits to all persons engaged by Lumbu Incorporated such as Ms. Pendergraft. Ms. Pendergraft acknowledged this by executing an Acknowledgement and Waiver Agreement with Lumbu Incorporated in which she represented and agreed that Lumbu Incorporated was solely responsible for compensating her and that she was not an employee of Arise.

6.      After receiving Ms. Lumbu's IBO number, Ms. Pendergraft signed up on Arise's website, which required her to input her personal-contact information and to upload a resume. Arise then assigned Ms. Pendergraft a personal ID number, called her "ACP ID," and provided

4

her with her own profile on its website. Ms. Pendergraft was also required to sign a nondisclosure agreement with Arise.

7.     To work for Arise, Ms. Pendergraft was required to purchase certain equipment. To fulfill these requirements, Ms. Pendergraft purchased two headsets and a computer, and installed a phone line that she dedicated to Arise. These items cost Ms. Pendergraft approximately $1500.

8.     Ms. Pendergraft was required to pass Arise's voice assessment and background check, for which she paid Arise approximately $12.95. Arise, and not Ms. Lumbu, administered Ms. Pendergraft's background check and voice assessment.

9.     Ms. Pendergraft next was required to enroll in CSP101, a required introductory course that teaches CSPs how to use Arise's system, for which she paid Arise (not Ms. Lumbu) $49.99. The course includes detailed instructions about using Arise's system to provide customer service for its customers and informs CSPs how they should communicate with Arise's clients. Arise explains that "[a]ll concerns regarding service fees, servicing hours, products, services, etc. should be brought to the attention of an Arise operations person **first**." (Claimant's Ex. 6, at 4714.) Ms. Pendergraft spent approximately three full days completing CSP101. She was not paid during this time. Ms. Pendergraft passed CSP101.

10.     To provide services in connection with specific projects, Lumbu Incorporated entered into Statements of Work ("SOWs") with Arise pursuant to the MSA. When a CSP or IBO is looking for projects to service, they view opportunity announcements through Arise's online portal. These opportunity announcements outline all of the requirements of a particular opportunity and fully explain the opportunity, so that the CSP or IBO can make an informed decision as to whether to pursue a particular project. The opportunity announcements explain

5

the hours parameters, quality requirements, certification courses, certification costs, and suggested equipment. IBOs, like Lumbu Incorporated, have access to opportunity announcements that also provide information on the service revenue. The CSP version of the same opportunity announcements do not provide this information because Arise pays IBOs and does not know the compensation arrangements an IBO has with its personnel. Arise does not exert any control over what projects CSPs and IBOs choose to pursue.

11.     Ms. Pendergraft signed up to provide customer service for Arise's client, AT&T. Ms. Pendergraft paid Arise $199 for the AT&T certification course. From May 29, 2012, through July 19, 2012, Ms. Pendergraft spent eight hours per day (four hours in class and four hours on homework), Monday through Friday, taking the AT&T certification class. If Ms. Pendergraft had missed more than one training course, Arise would have dismissed her from the class. From July 20, 2012, through July 26, 2012, Ms. Pendergraft spent twenty hours handling live customer calls as part of the nesting phase of her training. From July 27, 2012, through August 6, 2012, Ms. Pendergraft resumed the AT&T training course during which she worked eight hours per day without pay.

12.     The AT&T certification material is AT&T's material. The AT&T certification training is extremely detailed and taught Ms. Pendergraft everything she might need to know about providing service to AT&T's customers with sections titled "Manage Your Thinking to Deliver Great Service" and "The Customer Rules." It provides detailed instructions as to how CSPs should act in almost every possible scenario. If CSPs score 82% or higher on the certification course, they are then permitted to provide customer service for AT&T. If a CSP does not pass the certification or drops out of the course, the fee that she paid Arise for the course is not refunded.

13.     Ms. Pendergraft passed the AT&T certification course.  Arise then offered Lumbu Incorporated an AT&T SOW, which it accepted and designated Ms. Pendergraft to provide services on the AT&T Business KCA Application.  The SOW was set to expire on September 20, 2012.

14.     Ms. Pendergraft was then informed that rather than servicing clients, she would have to take another training course to learn AT&T's National Business Systems ("NBS").  Ms. Pendergraft was told that she would be paid for her time spent in this course.  Ms. Pendergraft spent about 80 hours on the NBS training course (four hours in class and about four hours of homework for ten days), but never received pay for this course.

15.     After her NBS training, Ms. Pendergraft began servicing clients.  Ms. Pendergraft was required to use Arise's system to sign up for at least twenty hours per week, including at least two hours on the weekend.  Arise released the hours at a certain time each week that Arise set, at which point Ms. Pendergraft had to be available to select released hours before they filled up.  If twenty hours were not available at the time of the initial release, Ms. Pendergraft had to continue checking Arise's system to see whether additional hours opened up or risk having her SOW terminated.  Ms. Pendergraft "had to take the hours [she] would get," which ended up being "late nights and just not very good hours."  As a result, Ms. Pendergraft was not free to pick her own hours, but rather, had to work during whatever hours Arise made available.

16.     Arise provided Ms. Pendergraft with unique login credentials that allowed her to access its system, and she was not permitted to give her login information to anyone else.  If Ms. Pendergraft wanted to take time off from working without being terminated by Arise for failure to meet its hours requirements, she was required to request a time-away ticket from Arise.

17.    The SOW outlined a set of eleven AT&T-driven service-level requirements, which measured the results achieved by Lumbu Incorporated as a result of Ms. Pendergraft's performance. Three of the service-level requirements were tracked by Arise, and the other eight were tracked by AT&T.

18.    Arise closely monitored Ms. Pendergraft's performance, which it measured based on a series of metrics that it also refers to as Key Performance Indicators. (Claimant's Ex. 6, at 4683-712) ("At Arise, performance is measured, analyzed, and managed."). Arise compiled Ms. Pendergraft's scores for each category and created a scorecard that aggregated this data. Arise also recorded all of Ms. Pendergraft's phone calls while she was servicing for AT&T. Arise generated invoices that showed Ms. Pendergraft's earnings based upon her rate of pay (as determined by Arise's metrics) and minutes worked.

19.    Ms. Pendergraft was assigned to two different types of supervisors, who monitored and assisted with her calls. Like CSPs, Arise also classifies these supervisors as independent contractors or employees of IBOs. Chat supervisors, who are called Performance Facilitators or "PFs" by Arise, were logged into chat rooms with Ms. Pendergraft while she was providing customer service and provided feedback if she reached out for assistance during calls. The supervisors also had the ability to take control of Ms. Pendergraft's sessions if they deemed it necessary because she was struggling with a customer. The supervisor would explain to the customer that she was Ms. Pendergraft's supervisor and that she would be assisting with the call. Quality assurance supervisors, who are called Quality Assurance Performance Facilitators or "QAPFs" by Arise, listened to Ms. Pendergraft's calls in real-time, and could speak to her to provide guidance during the call. They also listened to Ms. Pendergraft's recorded calls and graded them based upon Arise's metrics using forms provided by Arise. These scorecards listed

8

factors for evaluation such as whether Ms. Pendergraft used the customer's name and whether there was any silence during the conversation, as well as subjective elements such as courtesy, tone of voice, clarity of voice, and whether Ms. Pendergraft was trying her best to resolve the issue. Arise factored these grades into the metrics that determined Ms. Pendergraft's rate of pay, and they were also factored into Arise's decisions about whether to terminate her.

20.     Ms. Pendergraft was diligent about meeting with her supervisors each week and spent about two hours or more in required group meetings, referred to as huddles, or one-on-one sessions with her supervisor. The supervisors had access to Ms. Pendergraft's scorecards and customer-survey reports, so that they could assist her in meeting Arise's metrics. Arise tracks whether CSPs like Ms. Pendergraft meet with their supervisors, and considers attendance at one-on-one sessions and group huddles when determining whether to terminate a CSP.

21.     Ms. Pendergraft could have been paid at a rate of $9, $11, or $14 per hour, which was determined by the metric scores that were calculated by Arise. If Ms. Pendergraft failed to meet any aspect of her SOW (including the metrics required by Arise), Arise could terminate her contract. Arise often terminates the work of CSPs at any point during the term of an SOW, not just at the end of the contract period. In order for CSPs to ensure that they are in compliance with the maximum average handle time, they must cut some calls short before resolving a problem. Because the problem is not resolved, cutting a call short will negatively impact their Customer Satisfaction score. The difficulty in meeting all metrics at once means that most CSPs are typically in violation of at least one of their metrics at any given time, even if they are also a top performing CSP. Arise uses its discretion to make termination decisions when CSPs are in violation of their metrics and does not terminate all CSPs who fail to satisfy their metrics.

22.     Arise generated detailed invoices tracking Ms. Pendergraft's work and the rate she was to be paid for this work. Although Arise's invoices show that Ms. Pendergraft spent 17.19 hours on the phone with clients throughout July and August, these hours are only a small percentage of the time that Ms. Pendergraft actually spent working. In addition to her time spent on the phone with customers, Ms. Pendergraft had to spend additional time waiting for technical support, researching customer issues, and returning calls known as commitments. Arise's invoices also do not include any of this time or the time that Ms. Pendergraft spent in the huddles and one-on-ones with her supervisors each week. When the time spent on these required activities is added to the twenty hours per week (spread out in thirty-minute intervals) during which CSPs must be available to take calls for Arise's clients, the work is equivalent to a full-time job. Ms. Pendergraft therefore worked for about forty hours per week for three weeks.

23.     Ms. Lumbu played no role in Ms. Pendergraft's decision to take the training for AT&T and no role in which hours Ms. Pendergraft was able to provide service. Ms. Lumbu never graded any of Ms. Pendergraft's calls, provided any feedback on her performance, or participated in or spoke with Ms. Pendergraft about attending huddles and one-on-one meetings with Arise supervisors. Ms. Pendergraft understood Ms. Lumbu's role to be merely that Arise would pay Ms. Lumbu, Ms. Lumbu would take a percentage of Ms. Pendergraft's pay, and then Ms. Lumbu would pass the money on to Ms. Pendergraft. Throughout her time working for Arise, Ms. Pendergraft never met Ms. Lumbu in person.

24.     Ms. Pendergraft was not paid for most of her time spent working for Arise, receiving only one check for $96.12. When she contacted Arise, asking for help to collect the money that was owed to her, its representative responded only that she needed to direct any questions regarding her payment to her IBO.

25.     Frustrated by the circumstances, Ms. Pendergraft quit working for Arise in August 2012, and she has not performed any customer-service work since then.

26.     The minimum wage for Ms. Pendergraft's uncompensated hours is:

| | |
|---|---|
| CSP101 Training Time (unpaid): | $174.00 ($7.25 x 3 days x 8 hours) |
| AT&T Certification Time (unpaid): | $2,552.00 ($7.25 x 44 days x 8 hours) |
| NBS Certification Time (unpaid): | $580.00 ($7.25 x 10 days x 8 hours) |
| Hours Worked: | $870.00 ($7.25 x 3 weeks x 40 hours) |
| Total: | $4,176.00 |
| Amount Paid: | - $96.12 |
| | |
| Total owed: | $ 4,079.88 |

27.     The amount Ms. Pendergraft spent on equipment and training to work for Arise is:

| | |
|---|---|
| Background Check: | $12.95 |
| Home Office Equipment: | $1500.00 |
| CSP101: | $49.99 |
| AT&T Certification: | $199.00 |
| | |
| Total: | $1,761.94 |

28.     The total for Ms. Pendergraft's equipment and training costs and uncompensated minimum-wage is $5,841.82.

## CLAIMS AND COUNTERCLAIMS

Ms. Pendergraft claims that Respondent Arise Virtual Solutions Inc., misclassified her as an independent contractor in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and as a result, failed to pay her the minimum wage for all the weeks she worked.  She claims $4,079.88 is owed as minimum wage for uncompensated hours, less the amount she has been paid, and $1,761.94 that she spent on equipment and training to work for Arise.  Thus, the total amount that she seeks to recover for equipment and training costs, and minimum-wage damages is $5,841.82.  She also seeks to recover statutory liquidated damages, her attorney's fees, and costs.

Arise denies that Ms. Pendergraft was its employee and has brought a counterclaim for unjust enrichment in the event that Ms. Pendergraft prevails on her FLSA claim. According to Arise, by claiming retroactively that she was an employee and that she was not properly compensated for the services she promised to render through an independent contractor, Ms. Pendergraft has breached her agreement with Lumbu Incorporated (and, in turn Lumbu Incorporated's agreement with Arise) and therefore Arise should be allowed an offset for the fees that she has retained.

**ANALYSIS AND CONCLUSIONS**

*FLSA Claims*

Under the FLSA, courts look to the "economic reality" of a working relationship to determine whether a worker is an employee. *Scantland v. Jeffrey Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976). "[T]his inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee.'" *Scantland*, 721 F.3d at 1311 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947)); *see also Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1044 (5th Cir. 1987) ("[F]acile labels and subjective factors are only relevant to the extent that they mirror 'economic reality.'") (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). Courts have interpreted the law this way to avoid situations in which the nature of the relationship between the parties reflects that of an employer and employee in every way, but the employer aims to avoid this fact by creating a contract, and using labels that say otherwise. *See, e.g., Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 300 (5th Cir. 1975) ("The statutory coverage [of the FLSA] is not limited to those (whose work activities satisfy the

12

common law 'control' test) but rather to those who, as a matter of economic reality, are dependent upon the business to which they render service.").

Several factors guide the application of the economic-realities test to determine whether a worker is an employee: (1) the nature and degree of the employer's control; (2) the employee's opportunity for profit or loss depending upon her managerial skill; (3) the employee's relative investment in equipment or materials; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the employer's business. *Scantland*, 721 F.3d at 1311; *see Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 327 (5th Cir. 1993). In determining whether the economic reality reflects an employee relationship, the ultimate question is "whether the individual is 'in business for himself' or is 'dependent upon finding employment in the business of others.'" *Scantland*, 721 F.3d at 1312 (quoting *Mednick*, 508 F.2d at 301-02). If the answer is no, the plaintiff is an employee protected by the FLSA. *Mednick*, 508 F.2d at 302. For example, in *Mednick*, the plaintiff cardroom operator at an apartment house had the ability to set his own hours, the discretion to hire and fire his own employees. He received compensation exclusively from third parties and performed work that was not an integrated part of defendant's business. Because his patrons' access to the cardrooms was controlled by the defendant and there was no economic substance behind the powers he exercised, the Fifth Circuit determined that the plaintiff had nothing that could be called a business and had only the appearance to some degree of being an independent contractor. As a result, the court concluded that he was an employee for purposes of the FLSA. *Id.* at 302-03.

Ms. Pendergraft contends that whether examining each of the economic-reality factors one-by-one, or assessing the facts as a whole, the evidence weighs in favor of concluding that

she is properly classified as an employee of Arise. Alternatively, Ms. Pendergraft argues that if she was an employee of Mari Lumbu's IBO, as Arise contends, then Arise was at least her joint employer.

Arise responds that Ms. Pendergraft failed to satisfy her burden to prove that she was an Arise employee and not an independent contractor. Arise focuses on the fact that the parties themselves designated an independent-contractor relationship and that the evidence supports a finding that the parties undeniably communicated their intent to enter into an independent-contractor relationship. Additionally, Arise contends that an analysis of all the economic-reality factors lends further support to the conclusion that the parties subjectively intended and objectively understood that Pendergraft was not an employee of Arise.

To start, Arise argues that the formal relationships between and among Arise, Lumbu Incorporated, and Ms. Pendergraft, the documents describing those relationships, and the parties' subjective intent and objective understanding inform the economic-realities analysis. *See Scantland*, 721 F.3d at 311. As support, Arise relies upon: (1) the documents that Ms. Pendergraft saw or received indicating that she would not have an employment relationship with Arise; (2) Ms. Pendergraft's agreement with Lumbu Incorporated in which she acknowledged she was not an employee of Arise; and (3) Ms. Pendergraft's understanding that she was not an employee of Arise and that she did not hold herself out as an employee of Arise. Case law interpreting and applying the FLSA does not support Arise's argument. The label given the relationship at issue, the formal contract, and Ms. Pendergraft's subjective understanding of her work status under the law do not inform the question of whether Ms. Pendergraft was an Arise employee under the economic-realities test, much less control the outcome of the analysis. *See Scantland*, 721 F.3d at 1311; *Brack*, 814 F.2d at 1044; *Gate Guard Servs. L.P. v. Solis*, No. V-

14

10-91, 2013 WL 593418, at *11 (S.D. Tex. Feb. 13, 2013) (parties' designation of independent contractor-relationship is "relevant where it mirrors economic reality"). Rather, the inquiry is fact intensive and focuses on the economic-realities of the work relationship itself. *Scantland*, 721 F.3d at 1311; *Mednick*, 508 F.2d at 302.

The Arbitrator is also not prepared to accept Ms. Pendergraft's invitation to decide anything other than whether Ms. Pendergraft was an employee of Arise or a joint employee of Arise and Lumbu Incorporated for purposes of the FLSA. The fact-intensive inquiry required by this individual arbitration concerns Ms. Pendergraft's circumstances and her relationship with Arise and Lumbu Incorporated. That analysis follows.

*Control*. Arise argues that Ms. Pendergraft has failed to establish that Arise exercised control over the "manner and method" (the details) of her servicing, which justifies a finding that Ms. Pendergraft was not an employee of Arise. The Arbitrator disagrees with the control standard that Arise advocates.

The economic-realities test is broader than the common-law right-to-control test used to determine whether a worker is an employee or an independent contractor. *See Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014) (analyzing Oregon law and noting that "[t]he economic-realities test is broader than the right-to-control test, covering situations where the worker is not directed or controlled by the employer but, nevertheless, as a matter of economic reality, depends on the employer."); *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 300 (5th Cir. 1975) ("The statutory coverage [of the FLSA] is not limited to those (whose work activities satisfy the common law 'control' test) but rather to those who, as a matter of economic reality, are dependent upon the business to which they render service."). "Control is only significant when it shows an individual exerts such a control over a meaningful part of the

15

Case: 25-5495   08/29/2025   DktEntry: 6.1   Page 38 of 69

business that she stands as a separate economic entity." *Scantland*, 721 F.3d at 1313 (quoting *Usery*, 527 F.2d at 131); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). As a result, the question presented about control under the FLSA is whether, as a matter of economic reality, the worker is dependent upon the business to which she renders service. *Mednick*, 508 F.2d at 300.

Arise exercised significant control over Ms. Pendergraft from when she first signed up to be a CSP through Arise's website. Arise collected and stored Ms. Pendergraft's personal information, required Ms. Pendergraft to pass several evaluations that it administered, and provided her with detailed training so that she could perform her work according to Arise and its customer's requirements. *See Robles v. RFJD Holding Co.*, 2013 WL 2422625, *4 (S.D. Fla. June 3, 2013) (holding that "[t]he provision of training . . . indicated an employee-employer relationship."); *Craig v. FedEx Ground Package Sys., Inc.*, 335 P.3d 66, 85 (Kan. 2014) ("Whether FedEx trains its drivers is a factor [in determining employee status] because ordinarily one does not hire an independent contractor that requires training."). Once Ms. Pendergraft began providing support for its customer, Arise closely monitored all aspects of her work, and used the data it collected to determine what rate Ms. Pendergraft would be paid, and whether she would continue to work for Arise's customer. Arise assigned supervisors to work with Ms. Pendergraft, both to evaluate the work that she was doing and to assist in the event that she was having trouble with a customer's question.

The case law recognizes facts like these as evidence of employee status. In *Kerce v. W. Telemarketing Corp.*, 575 F. Supp. 2d 1354 (S.D. Ga. 2008), for example, plaintiffs challenged their status as independent contractors with a telemarketing service whose business model was like Arise's. Similar to Arise, the defendant "provide[d] reports to its clients that measure[d] the

home agents' performance in several areas, including average handle time, call volume, average speed of answer, sales per hour, rate of abandonment, quota attainment, and order conversion percentages." *Id.* at 1360. The court found that this control weighed in favor of employee status. *Id.*

In *Scantland*, the Eleventh Circuit found that cable technicians "were subject to meaningful supervision and monitoring by [defendant]" when, like Ms. Pendergraft, they were required to log in and out of a service that indicated when they arrived at and completed jobs, the defendant reviewed the technicians' work and tracked their quality control ratings, and the defendant could give technicians remedial training or terminate them if their ratings were consistently low. 721 F.3d at 1314. The court in *Scantland* also found evidence of control because the defendant could deduct money from technicians' pay where they failed to meet certain requirements. *Id.* The deductions in *Scantland* are analogous to Arise's ability to lower Ms. Pendergraft's rate of pay if she failed to meet certain metrics.

In *Robles*, a federal district court determined that a commercial cleaning business exercised significant control over cleaners when the defendant had multiple supervisors who regularly oversaw the cleaners' work, were responsible for orienting the cleaners to their initial jobs, and monitored compliance with their contracts. 2013 WL 2422625, *4. The role of the supervisors in *Robles* is analogous to that of Ms. Pendergraft's supervisors at Arise. The court in *Robles* also found evidence of control in the fact that the cleaning business provided the cleaners with detailed checklists based upon customer specifications. *Id.* Similarly, during certification training, Arise provided Ms. Pendergraft with detailed scripts for speaking to customers. *See Hill v. Cobb*, 2014 WL 3810226, *5 (N.D. Miss. Aug. 1, 2014) (finding control weighed in favor of employee status when agents were required to use the defendant's contract and were

reprimanded for deviating from required practices, and defendant had delegated supervisory authority); *Parrilla v. Allcom Constr. & Installation Servs., LLC*, 2009 WL 2868432, *3 (M.D. Fla. Aug. 31, 2009) (evidence of control when defendant supervised the manner in which technicians carried out their work, provided them with specifications on how to perform work and assessed monetary penalties based on performance (that technicians had no way to dispute or negotiate), supervisors monitored technicians after or during jobs, and technicians had to request time off or risk being penalized).

Arise counters with other evidence that it claims weighs against employee status. First, Arise's customers, and not Arise, set the requirements for the CSPs who worked on the customers' SOWs. Courts, however, have not been persuaded that this fact weighs against employee status. In *Sakacsi v. Quicksilver Delivery Sys., Inc.*, a courier service argued that many of the requirements it imposed on its drivers were attributable to its customers' requirements. 2007 WL 4218984, *5 (M.D. Fla. Nov. 28, 2007). The court rejected this argument, explaining: "The Court finds this argument unpersuasive in light of the fact that [a]ny employer's business is, in essence, dictated by the needs of its customers. . . . The key inquiry, rather, is how QDS goes about meeting the [customers'] needs, and to what extent the chosen methods operate to control the activities of QDS drivers and in turn restrict their autonomy." *Id.*; *see also Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014) (noting that "[t]he customers are FedEx's customers, not the drivers' customers."); *Robles*, 2013 WL 2422625, *5 ("While Defendants—as all businesses to some degree—may certainly have been concerned with 'customer satisfaction,' Defendants manifested that concern through closely controlling and monitoring Plaintiffs' work habits and methods. Accordingly, the first factor weighs in favor of finding that Plaintiffs were 'employees' under the FLSA.").

Next, Ms. Pendergraft, and not Arise, controlled which hours she worked, or which clients she worked for.  Courts have determined that this evidence alone does not show the requisite "control over a meaningful part of the business" to weigh against employee status. *See, e.g., Usery*, 527 F.2d at 1312 ("[Workers] who work at home, completely free of specific hour requirements, have been found to be employees for purposes of [the FLSA].") (citing *Goldberg*, 366 U.S. at 32); *see also Mednick*, 508 F.2d at 299 (concluding that plaintiff was an employee although defendant "did not set hours" or "even require that [plaintiff] be present"); *Hill*, 2014 WL 3810226, *4 (finding control weighed in favor of employee status although "[i]t [was] undisputed that [plaintiff] was required to work no specific hours, and could come and go as he pleased"); *Robles*, 2013 WL 2422625, at *3 (finding control weighed in favor of employee status although defendants "were concerned only with customer satisfaction and not the day-to-day regulation of Plaintiffs' "work habits, hours worked, or work methods."); *Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1349 (M.D. Fla. 1997) (finding that a worker's "freedom to work when she wants and for whomever she wants" did not amount to control over a meaningful part of the business).

Because Ms. Pendergraft had to be available to sign up whenever Arise released the hours, and she had to take whatever was available in order to meet Arise's minimum requirements, she was not completely free to choose her hours.  The hours available to her were not desirable (*e.g.*, late nights) and did not make for a cohesive schedule.  If sufficient hours were not available for her to meet the minimum requirements, then Ms. Pendergraft was required to keep checking for additional hours to be released.  Ms. Pendergraft was also required to attend training classes and meetings with her supervisors at certain times.  When a company has this type of involvement with a worker's hours, it can constitute control over her schedule. *See*

*Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1043 (9th Cir. 2014) (concluding that FedEx had the right to control its drivers when it did not set specific working hours, but "[t]he combined effect of [its] requirements [was] substantially to define and constrain the hours that FedEx's drivers can work"); *Scantland*, 721 F.3d at 1313-14 (technicians' agreements, which provided that they could decline any work assignments, but in reality they could not reject work without the threat of termination or reduced assignments, and might be required to attend various meetings was evidence of control); *Clincy v. Galardi S. Enters., Inc.*, 808 F. Supp. 2d 1326, 1332 (N.D. Ga. 2011) (finding defendant nightclub owners had control over dancers' schedules when the dancers could choose which shifts to sign up for, but were fined or disciplined for not working on scheduled nights without calling ahead, and dancers were asked to work a certain number of slow days and would be fined if they failed to meet the requirements); *see also Usery* 527 F.2d at 1312 ("It is not significant how one 'could have' acted under the contract terms. The controlling economic realities are reflected by the way one actually acts.").[1]

On this record, any control that Ms. Pendergraft exerted did not evidence "such control over a meaningful part of the business that she stands as a separate economic unit." *Scantland*, 721 F.3d at 1313. As a matter of economic reality, Ms. Pendergraft instead was dependent upon Arise. *See Mednick*, 508 F.2d at 300. The control factor weighs in favor of employee status.

*Significant Opportunity for Profit and Loss.* The only way Ms. Pendergraft could increase her earnings was to sign up for more hours with Arise (if she was able to), and work within Arise's system to increase her pay rate (from $9 to $14 per hour) by increasing her metrics. Courts have found that payment by the hour or time, rather than by the job, is suggestive of employee status. *See Chapman v. A.S.U.I. Healthcare & Dev. Ctr.*, 562 F. App'x

---

[1] The Arbitrator is not persuaded that the cases cited by Arise on the control issue lead to a different result on the evidence presented.

182, 184-85 (5th Cir. 2014) (when defendant "determined how much to pay [plaintiffs] on an hourly basis and when to increase their hourly rate" and "[t]here was no opportunity for the plaintiffs to profit beyond their hourly wage, and they were not at risk to suffer any capital losses," there was evidence of control) *cert. denied*, 134 S. Ct. 2733 (2014).

Ms. Pendergraft had no real opportunity, given her circumstances, to generate profit and loss based on her managerial skill. Arise advertised to attract big businesses like AT&T to use the workforce it had created. Ms. Pendergraft had no means to attract these customers on her own and no means to provide customer service for clients other than by using Arise's software. Ms. Pendergraft never provided customer service for clients outside of the time she spent working for Arise. Courts have found that in similar circumstances, the opportunity for profit and loss weighs in favor of employee status. *See Kerce*, 575 F. Supp. 2d at 1361 (finding that opportunity for profit and loss weighed in favor of employee status when plaintiffs only responded to, and did not initiate, calls that defendants' clients generated, the plaintiffs' training was specific to a particular client, and plaintiffs had no control over call volume); *see also Brock*, 814 F.2d at 1050 (firework-stand operators did not have significant opportunity for profit and loss when defendant controlled the advertising and prices at which the fireworks were sold); *Usery*, 527 F.2d at 1313 (opportunity for profit or loss weighed in favor of employee status when determinants of customer volume were controlled by defendant). Similarly, in this case, the opportunity for profit and loss weighs in favor of employee status.

*Relative Investment in Equipment.* In measuring an employee's investment in equipment or materials, courts look at the alleged employee's relative investment as compared with that of the alleged employer. *Reich*, 998 F.2d at 327. Ms. Pendergraft purchased her own computer equipment. The equipment she purchased allowed her to access Arise's online tools, without

21

which she could not deliver customer support for large businesses. Her investment was extremely minor when compared with the substantial investment that Arise made in the software that is used (and was necessary) to service its clients. *See, e.g., Sakacsi*, 2007 WL 4218984, *7 (finding relative investment weighed in favor of employee status when courier service's cost for purchasing software used to scan deliveries into system far outweighed the drivers' costs for the purchase of cars, gas, maintenance, and automobile insurance); *Clincy*, 808 F. Supp. 2d at 1346-47 (relative-investment factor weighed in favor of employee status when dancer's $50,000 annual investment related to her work did not exceed the nightclub's investment in its business) *see also Brock*, 814 F.2d at 1053 (relative-investment factor weighed in favor of employee status when "[b]ut for [defendant's] provision of all costly necessities, [plaintiffs] could not operate"). The relative-investment factor weighs in favor of employee status.

*Skill and Initiative.* No prior experience or training was necessary in order for a CSP, like Ms. Pendergraft, to work for Arise, and Ms. Pendergraft was required to undergo two detailed trainings, which provided instruction about effective customer service before she could work for Arise. *See Alexander*, 765 F.3d at 995 (skill factor weighed in favor of employee status when plaintiffs "need no experience to get the job in the first place"); *Kerce*, 575 F. Supp. 2d at 1361 (finding evidence of employee status when there was no special skill required beyond the training offered by the defendant); *Parrilla*, 2009 WL 2868432, *5 (no special skill required when technicians underwent two-week training at start of employment). The fact that CSPs could increase their hourly rate (within the parameters set by Arise) by performing well according to Arise's metrics does not exhibit the kind of skill that is relevant to this factor. Rather, courts have held that initiative, not efficiency, is the standard for economic independence. *See Usery*, 527 F.2d at 1314 ("Routine work which requires industry and

22

efficiency is not indicative of independence and nonemployee status. . . .  All major components open to initiative-advertising, pricing, and most importantly the choice of [customers] with which to deal are controlled by [defendant].").  The skill and initiative required to perform Ms. Pendergraft's job weighs in favor of employee status.

*Long-Term Relationship.*  When Ms. Pendergraft signed up to work for Arise, she intended that the job would be long term.  This is evidenced not only by her testimony about her subjective intent but also by her commitment of time, effort, and money over several months to train and qualify to work for Arise's customer, AT&T.  *See Sales v. Bailey*, 2014 WL 3897726, *11 (N.D. Miss. Aug. 8, 2014) (duration of relationship weighed in favor of employee status when some plaintiffs worked for shorter periods but had "sought an indefinite employment relationship"); *Kerce*, 575 F. Supp. 2d at 1361 (plaintiff's completion of significant training suggested dedication and an intent to establish an ongoing working relationship of some length weighed in favor of employee status).  That Ms. Pendergraft quit her work after a short period of time does not undercut her original intent.

In contrast, Arise structured and offered opportunities to IBOs and CSPs, including Ms. Pendergraft, to work for its customers on a short-term basis.  Statements of Work offered by Arise on behalf of its customers typically were for three-month periods, and the AT&T SOW that Lumbu Incorporated accepted and under which Ms. Pendergraft provided service to AT&T customers was no exception.  Independent contractors are more often hired for short discrete projects.  *Thibault v. BellSouth Telecommunications, Inc.*, 612 F.3d 843, 846 (5th Cir. 2010).  Arise also points out that Ms. Pendergraft was free to work for other companies while she worked for Arise.  Although the evidence is undisputed that this was a nonexclusive relationship, Arise's performance metrics and Ms. Pendergraft's scheduling difficulties effectively precluded

her from working for any other company. On all this evidence, the long-term relationship factor does not weigh in favor of or against employee status.

*Role of CSPs in Arise's Business.* Arise's business model consists of selling customer-support services to its clients by providing a technological platform that allows CSPs, through their own or another's IBO, from their homes or elsewhere, to provide customer support for Arise's clients. Arise's business model revolves around selling these customer-support services, as evidenced by the effort Arise puts into recruiting, training, and supervising CSPs, and its advertisements on its own website. [2] Without CSPs, Arise would have no service to sell, and would cease to function. *See Alexander,* 765 F.3d at 996 (holding this factor weighed in favor of employee status because "[t]he work that the drivers perform, . . . is 'essential to FedEx's core business'"); *Robles,* 2013 WL 2422625, *7; *Molina,* 420 F. Supp. 2d at 1287. The control that Arise maintained over the services performed by CSPs is evidence of the importance that Ms. Pendergraft's work as a CSP plays in Arise's business. *See Scantland,* 721 F.3d at 1319 (holding that cable technicians were an integral part of the business when the level of control exercised over technicians showed that this was an important part of the business); *Kerce,* 575 F. Supp. 2d at 1361 (noting that the defendant exerted a great deal of control and influence over its agents because the services they provided constituted an important part of its business). The final

---

[2] Courts have repeatedly rejected companies' attempts to disclaim the true nature of their business. *See, e.g., Schwann v. FedEx Ground Package Sys., Inc.,* 2013 WL 3353776, *5 (D. Mass. July 3, 2013) ("FedEx's attempt to minimize its own characterizations of its services [was] unpersuasive" when "FedEx advertises that it offers package pick-up and delivery services and its customers have no reason to believe otherwise"). *De Giovanni v. Jani-King Int'l, Inc.,* U.S. Dist. Ct. C.A. No. 07-10066-MLW at 98-99 (D. Mass. June 6, 2012) (R. 263-64) (considering the fact that "[t]he Jani-King website offers 'commercial cleaning services,'" as evidence that janitors performed services in the usual course of Jani-King's business - despite defendants' contention that they sold franchises as their usual course of business). *Clincy,* 808 F. Supp. 2d at 1348 (considering the fact that the club's website and billboard featured scantily clad women and it advertised in adult magazines as evidence that nude dancers were integral to its business despite the club's contention that nude entertainment was not its essential function).

factor, whether CSPs, like Ms. Pendergraft, are vital to Arise's business, weighs in favor of employee status.

Having studied the law cited by the parties, reviewed all the evidence, and weighed the evidence pursuant to the economic-realities test, the Arbitrator concludes that Arise misclassified Ms. Pendergraft as an independent contractor and that Ms. Pendergraft instead was an Arise employee under the FLSA. Because the Arbitrator has concluded that Ms. Pendergraft was an employee of Arise, there is no need to decide the alternatively presented question of whether Arise was responsible for compliance with the FLSA as Ms. Pendergraft's joint employer.

### *FLSA Remedies*

*Minimum Wage.* As Ms. Pendergraft's employer, Arise is required under the FLSA to compensate her at minimum wage ($7.25 per hour) for all the time that she worked for Arise, including training time. 29 U.S.C. § 206; *see Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 916 (S.D. Tex. 2009); *Rodriguez v. Carey Int'l, Inc.*, 2004 WL 5582173, *6 (S.D. Fla. Sept. 15, 2004). Ms. Pendergraft was not paid at all for the nearly three months of training she completed to work for Arise, nor was she paid for most of the hours she spent providing service to Arise's clients. Pursuant to fact finding number 26, Ms. Pendergraft is entitled to recover $4,079.88 as minimum-wage damages.

*Expenses.* Ms. Pendergraft seeks to recover the expenses she had to pay to work for Arise, including the cost of her home-office equipment, her background check, and the training courses. *See* Finding of Fact No. 27. Pre-employment expenses are recoverable if they are "primarily for the benefit of the employer," meaning items "which will be used in or are specifically required for the performance of the employer's particular work." *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1237 n.10 (11th Cir. 2002).

The background check, CSP101, and AT&T certification were all required in order for Ms. Pendergraft to work for Arise and primarily benefited Arise. The background check allowed Arise to ensure that only those who met its specifications could gain access to its system, and Ms. Pendergraft could not use these background-check results to secure any other employment. The CSP101 course taught Ms. Pendergraft how to use Arise's software and how to be an effective CSP for Arise. The AT&T certification course taught Ms. Pendergraft how to use Arise's software to provide services for Arise's customer AT&T. Neither CSP101 nor the AT&T certification courses benefitted Ms. Pendergraft in any way but to allow her to work for Arise. Arise benefited by training Ms. Pendergraft to satisfy Arise, and its customer AT&T's, needs. *See id.*

The equipment that Ms. Pendergraft bought was also required for her employment and thus was primarily beneficial to Arise. Arise's technology guide explains the minimum computer hardware and software requirements that all CSPs needed to satisfy, and Ms. Pendergraft purchased new equipment to meet these needs. Although Arise argues some of this equipment was for personal use, rather than for use with Arise, Ms. Pendergraft testified that she purchased these items to be able to work for Arise, and thus Arise, not Ms. Pendergraft, primarily benefitted from their purchase.

Pursuant to fact finding number 27, Ms. Pendergraft is entitled to receive $1,761.94 for her training and equipment expenses. *See Arriaga*, 305 F.3d at 1237 (holding that expenses that had to be paid in order to perform the job were recoverable because they drove employees' wages below minimum wage during the first week of work).

*Statutory Liquidated Damages.* The FLSA provides for mandatory liquidated damages when the statute is violated. 29 U.S.C. § 216(b) ("Any employer who violates the provisions of

section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, . . . and in an additional equal amount as liquidated damages.")  To avoid statutory liquidated damages, "[a] FLSA-liable employer bears the 'difficult' burden of proving both subjective good faith and objective reasonableness, 'with double damages being the norm and single damages the exception.'"  *Alvarez v. IBP, Inc.*, 339 F.3d 894, 910 (9th Cir. 2003) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 141 (2nd Cir. 1999)); *see* 29 U.S.C. § 260.

In order to prove subjective good faith, "the [employer has the burden of proving] that [it] had 'an honest intention to ascertain what [the FLSA] requires and to act in accordance with it.'"  *Dybach*, 942 F.2d at 1566-67.  Employers must present evidence of affirmative action taken to try to ensure FLSA compliance in order to meet this high standard for good faith.  *See, e.g.*, *Wajcman v. Inv. Corp. of Palm Beach*, 620 F. Supp. 2d 1353, 1358-59 (S.D. Fla. 2009) (employer showed subjective good faith through testimony that it consulted with attorneys, familiarized itself with the law, and ascertained the practices of similar businesses in the area before implementing tip-pool policy); *Kennedy v. Critical Intervention Servs., Inc.*, 199 F. Supp. 2d 1305, 1307 (M.D. Fla. 2002) (employer showed sufficient evidence of subjective good faith when it sought legal advice concerning its compliance with the FLSA, relying upon a letter and memorandum containing such advice); *Garcia v. Allsup's Convenience Stores, Inc.*, 167 F. Supp. 2d 1308, 1316 (D.N.M. 2001) (employer showed subjective good faith through evidence that it had relied upon qualified professionals retained to provide advice regarding implementation of its payment scheme); *Nelson v. Alabama Inst. For Deaf & Blind*, 896 F. Supp. 1108, 1115 (N.D. Ala. 1995) (employer put forth sufficient evidence of good faith when its director of personnel submitted affidavit stating that she had attended seminars on the FLSA, studied the statutes,

regulations, and agency opinions, and traveled to meet with the DOL Wage and Hour specialist, who assured her that her proposed compensation plan was in compliance with the FLSA).

"An employer establishes a good faith defense to liquidated damages by diligently consulting legal specialists and labor specialists and following their advice." *Garcia*, 167 F. Supp. 2d at 1316; *see Fuentes v. CAI Int'l, Inc.*, 728 F. Supp. 2d 1347, 1358 (S.D. Fla. 2010) ("[T]o reap the benefit of the good faith defense of section 260 based on the advice of counsel the defendant must honestly and truly seek the advice of counsel, counsel must give advice that is reasonable in a legal sense, and the defendant must act in strict conformity with that advice."); *see also Barnard v. Intertek USA Inc.*, 2012 WL 3929838, *8 (S.D. Tex. Aug. 2, 2012) *report and recommendation adopted*, 2012 WL 3929872 (S.D. Tex. Sept. 7, 2012) (finding employer did not have sufficient evidence to show good faith where it sought legal advice but the memorandum it received did not definitively show compliance with the FLSA, and defendant took no further steps to determine whether its policy was compliant); *Silas v. Hillsborough Cnty., Florida*, 2006 WL 3133026, *6 (M.D. Fla. Oct. 30, 2006) (employer's letter to DOL seeking to resolve questions about FLSA compliance indicated that the issues were raised by the DOL, not the Defendant, and therefore was not conclusive evidence that Defendant "had an honest intention to ascertain what the FLSA requires"). Arise has presented no evidence of this type. Arise also failed to present any evidence of objective reasonableness, which similarly "requires some duty to investigate potential liability under FLSA." *Friedman v. S. Florida Psychiatric Assocs., Inc.*, 139 F. App'x 183, 186 (11th Cir. 2005) (quoting *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979)).

Ms. Pendergraft is therefore entitled to recover $5,841.82 as liquidated damages in addition to her pre-employment expenses and minimum wage. *Dybach v. State of Fla. Dep't of*

*Corr.*, 942 F.2d 1562, 1566-67 (11th Cir. 1991) (Absent showing of both the subjective and objective elements of the good faith defense, liquidated damages are "mandatory."); *see also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999) ("Liquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA.") (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583-84 (1942)).

### *Arise's Counterclaim for Restitution*

Because Ms. Pendergraft has prevailed on her FLSA claim, Arise's counterclaim for unjust enrichment is now at issue. Arise seeks to prevent Ms. Pendergraft from receiving a windfall by retaining payments made by Lumbu Incorporated to her, while being awarded a minimum wage. To succeed on a claim for unjust enrichment under the applicable Florida law, Arise must prove that: Arise has conferred a benefit on Ms. Pendergraft; Ms. Pendergraft has knowledge of the benefit; Ms. Pendergraft accepted or retained the benefit conferred; and the circumstances are such that it would be inequitable for Ms. Pendergraft to retain the benefit without paying fair value for it. *See Ruck Bros. Brik v. Kellogg & Kimsey*, 668 So. 2d 205, 207 (Fla. Dist. Ct. App. 1995). Because the award to Ms. Pendergraft of her minimum wage on this record includes an offset of $96.12, which accounts for the payment that Ms. Pendergraft received from Arise through Lumbu Incorporated, Arise's unjust-enrichment counterclaim is moot. Alternatively, if there is any additional money that should be attributed as payments to Ms. Pendergraft from Arise, the record contains no evidence of the amount, and the Arbitrator declines to order restitution.

*Attorney's fees and costs.* Ms. Pendergraft's claim for attorney's fees and costs will be addressed in the Final Award following the parties' submission of briefing and evidence relevant to this claim.

## INTERIM AWARD

For the above-stated reasons, Claimant Tami Pendergraft shall recover $11,683.64 from Respondent Arise Virtual Solutions Inc., comprising $5,841.82 for her equipment and training costs and minimum-wage damages, and $5,841.82 as statutory liquidated damages.  Ms. Pendergraft shall submit evidence and briefing to support her claim to recover attorney's fees and costs and the amount she seeks to recover no later than February 16, 2015, and Arise shall submit its evidence and briefing in response to Ms. Pendergraft's submission no later than February 25, 2015.  Alternatively, if the parties are able to stipulate that Ms. Pendergraft is entitled to recover her attorney's fees and costs and the amount of fees and costs to be awarded to her, then the parties shall submit their stipulation no later than February 16, 2015.  The Arbitrator then will issue a Final Award that addresses Claimant's claim for costs and attorney's fees.

DATE:  February 4, 2015.

Deborah G. Hankinson, Arbitrator

# EXHIBIT E



## American Arbitration Association

## EMPLOYMENT ARBITRATION TRIBUNAL

### Case No: 32–160–00496–13

AYUB ABDUL-HAQQ,
      Claimant/Counter-Respondent,

v.

ARISE VIRTUAL SOLUTIONS, INC.,
      Respondent/Counter-Claimant.

AND

ARISE VIRTUAL SOLUTIONS, INC.
      Cross-Claimant,

v.

A & A VIRTUAL SOLUTIONS,
      Cross-Claim Respondent.

---

### INTERIM AWARD

---

Before Arbitrator:

Karen Evans, Esquire
Litigation Resolution, Inc.
Suite 1229
169 East Flagler Street
Miami, Florida  33131

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the dispute resolution provision contained within the March 7, 2012 Master Services Agreement, with similar language contained in the January 16, 2103 and February 15, 2013 Statements of Work, all of which are the subject of

Case No. 32-160-00496-13

the claim, counterclaim and cross-claim herein and which have been consented to and entered into between A & A Virtual Solutions (and executed by its President Ayub Abdul-Haqq) and Arise Virtual Solutions, Inc.; having been duly sworn; having heard and considered the live testimony of Ayub Abdul-Haqq, Ayman Latif, Joseph Otis, Robert Padron and James Clinton and a video-deposition excerpt of Ayub Abdul-Haqq; having further considered the exhibits introduced during the Final Hearing January 19 and 20, 2015 and having considered each party's Post-Hearing Brief together with the legal authorities submitted with both the pre-hearing and post hearing briefs; in accordance with the Employment Rules of the American Arbitration Association[1], hereby, FIND and enter the following INTERIM AWARD:

## THE BACKGROUND AND THE PARTIES' ALLEGATIONS

The Claimant's Demand for Arbitration, together with the exhibits thereto which include the First Amended Class Action Complaint previously filed in the United States District Court for the Southern District of Florida, seeks damages for an alleged misclassification of Mr. Ayub Abdul-Haqq (hereinafter "Abdul-Haqq" or "Claimant") as an independent contractor and not as an employee. The Demand and the First Amended Class Action Complaint sought damages pursuant to the Fair Labor Standards Act, the Florida Minimum Wage Act and the Florida Constitution. At the Final Hearing and in the Claimant's Post-Hearing Brief, the arguments solely addressed the Fair Labor Standards Act. Accordingly, as to the Claimant's request for relief, the facts and law analyzed herein will be confined to the Fair Labor Standards Act. The Claimant seeks

---

1 Claimant, who alleges he was an employee misclassified as an independent contractor, filed his Demand for Arbitration pursuant to the AAA Employment Arbitration Rules. Respondent, which alleges Claimant was an independent contractor acting through his independent business organization, filed its Demand for Arbitration pursuant to the AAA Commercial Arbitration Rules. Pursuant to the Parties' agreement as announced at the February 26, 2014 Preliminary Hearing and confirmed in the Report of Preliminary Hearing and Scheduling Order, the Employment Arbitration Rules and Mediation Procedures as amended and effective June 1, 2009 apply to this arbitration. Said agreement was made without a waiver of Respondent's position and defenses in this matter and without prejudice to Respondent's position in other arbitrations.

Case No. 32-160-00496-13

minimum wages of $5,191.00 for time spent in training and certification and seeks $1,335.00 in reimbursement for money spent on home office equipment and two training courses. Claimant requests an award of the two amounts totaled and liquidated for an interim award of $13,052.00, to be followed by an award of reasonable attorney's fees and costs.

Arise Virtual Solutions, Inc.'s (hereinafter "Arise" or "Respondent") Answer includes twenty-one affirmative defenses, a counterclaim and a cross-claim against A & A Virtual Solutions (hereinafter "A & A") which is the corporate entity through which Claimant provided services to Respondent. The two count counterclaim is for Unjust Enrichment and Declaratory Judgment. The claim for Unjust Enrichment alleges that Abdul-Haqq would be unjustly enriched if he were to keep the money paid to his corporation (when both parties operated under the premise that Abdul-Haqq was an independent contractor) and also, pursuant to this Arbitration, be awarded money as a misclassified employee. Arise seeks "the relief of restitution, disgorgement, interest, reasonable attorney's fees and costs of suit." Pursuant to the Declaratory Judgment count, Arise seeks a declaration that Claimant, or A & A, materially breached the parties' Master Services Agreement (hereinafter "MSA"), that Arise may properly and without liability terminate the MSA, all Statements of Work (hereinafter "SOWs"), and all schedules, appendices, and exhibits attached thereto, and that such termination will not be retaliatory. The Cross-Claim also contains two counts; one for Indemnification and one for Declaratory Judgment. Indemnification is sought pursuant to a paragraph within the various Arise and A & A contracts which provide for indemnification in case of breach of contract. The Declaratory Judgment count mirrors that in the Counterclaim. The Affirmative Defenses are 1) Failure to State a Cause of Action, 2) Failure to State a Cause of Action for Damages, 3) No Collective/Class Representative Action, 4) Accord and Satisfaction; Payment, 5) Release, 6) Unclean Hands/In Pari Delicto, 7) Knowing Submission/Consent, 8) Failure to Join an Indispensible Party, 9)

3

IB's Independent Contractor Status, 10) No Respondeat Superior Liability, 11) Not Joint Employer, 12) Breach of Contract, 13) Conduct Reasonable and in Good Faith/Not Willful, 14) Waiver, Discharge and Abandonment, 15) Estoppel, 16) Setoff and Recoupment, 17) Collateral Estoppel, 18) No Punitive or Liquidated Damages, 19) Adequate Remedy at Law, 20) Attorneys' Fees, and 21) Operative Arbitration Rules.

An Answer, with fourteen affirmative defenses, was filed in response to the Counterclaim and Cross-Claim. The affirmative defenses are 1) failure to allege facts sufficient to state a cause of action, 2) violation of the anti-retaliation provision of the FLSA, 3) estoppel, 4) waiver, 5) laches, 6) unclean hands, 7) unjust enrichment, 8) allegations not expressly admitted are denied, 9) Agreement void as against public policy, 10) unconscionable and unenforceable, 11) Agreement does not provide for the relief requested, 12) declaratory, injunctive and/or other equitable relief barred due to adequate remedies at law and no damages, 13) no damages caused by Claimant, and 14) Claimant's actions did not violate the Agreement.

## DEMAND PURSUANT TO FAIR LABOR STANDARDS ACT

Arise argues that both the contract language and the Claimant's testimony as to employment status are important factors in Respondent's favor.

The Parties' initial contract (the MSA) which governed all further dealings starts with the stated premise that the signatories "desire to create an independent contractor relationship with one another." Additionally, after the definition paragraphs, the entire first section of the MSA is entitled "Independent Contractor Relationship" and contains ten separately numbered paragraphs detailing the parties' intent and actions designed to accomplish their goal of an independent contractor relationship. Exhibit A to said MSA is a waiver required to be signed by every ACP (later known as CSP) stating that, *inter alia*, the signatory is not an employee of Arise and not entitled to benefits from Arise.

Case No: 32-160-00496-13

Similarly, the SOWs executed for each individual assignment contained a multi-paragraph section of representations and warranties to support independent contractor status.

Mr. Abdul-Haqq's own testimony during the Final Hearing, both at page 155, lines 11 – 14 and at page 571, lines 2 – 4 and line 11, was that he was not an employee of Arise, and he never claimed to be an employee of Arise.

These facts do not, however, determine the outcome of the question at hand. As to both the MSA and SOW contract language and Mr. Abdul-Haqq's testimony, one can look to the language of a case cited by both Claimant and Respondent. The appellate court in *Usery v. Pilgrim Equipment Company, Inc., et al.* 527 F.2d 1308 (5th Cir. 1976)[2] stated, with regard to laundry operators working pursuant to lease agreements with independent contractor references,

> We reject both the declaration in the lease agreement that the operators are "independent contractors" and the uncontradicted testimony that the operators believed that they were, in fact, in business for themselves as controlling FLSA employee status. Neither contractual recitations [footnote citations omitted] nor subjective intent [footnote citations omitted] can mandate the outcome in these cases. Broader economic realities are determinative.

Similarly, in the *Ferreira v. Network Express, Inc.,* 2007 WL 8097539 (M.D. Fla.) case cited by Respondent, the following quote taken from *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) appears:

> The labels given to the arrangement by the parties involved are not determinative, and "employee status" has been held to be unwaivable. *See, e.g., id.* at 729.

Arise additionally argues that the fact that Mr. Abdul-Haqq created his own independent business entity which employed him and six other individuals (whom he hired to likewise work for Arise clients) is indicative of his not being

---

2 In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the United States Court of Appeals, 11th Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

Case No: 32-160-00496-13

an employee of Arise.  The cases submitted by the parties, however, do not support such a finding.  *Mednick v. Albert Enterprises, Inc.,* 508 F.2d 297 (5th Cir. 1975) did not involve an individual who had his own business entity; however he did hire and fire his own employees.  Mr. Mednick received money from both the alleged employer and compensation from third parties.  In reversing a trial court finding of independent contractor status, Judge Godbold wrote:

> There are factors which arguably suggest that Mednick was an independent contractor.  He hired and fired his own employees.  But the courts have had little difficulty in finding employment status though the employee could hire others within his own discretion.  *Rutherford*, supra, *Twyeffort*, supra, *Mitchell v. Strickland Transportation Co.,* 228 F.2d 124 (CA5, 1995).
>
>                     * * *
>
> The Supreme Court has also held that even relationships deriving from corporate identities properly established under state law will not be controlling for ascertaining whether the relationship is also one of employment, *vel non,* for the purposes of the FLSA.  *Goldberg v. Whitaker House Coop. supra.*

*Padjuran v. Aventura Limousine & Transportation Service, Inc.,* 500 F.Supp.2d 1359 (So.Dist.Fla., 2007) involved a chauffeur seeking unpaid wages and overtime pursuant to the FLSA.  Defendant sought to dismiss the claim, in part, because it did not do business with Mr. Padjuran directly, but through Elite Group of Miami, Inc., an entity of which Mr. Padjuran was the president and sole shareholder.  Judge Huck denied the motion to dismiss as he was obligated to accept the material allegations as true.  Judge Huck, went on to state in his opinion, however,

> "Moreover, the fact that the parties here may have entered into a relationship which appeared on paper to be that between a business and an independent contractor is  not dispositive of the issue of whether Plaintiff was, in reality, an employee as opposed to an independent contractor for FLSA purposes.  *See, e.g., Harrell v.*

6

*Diamond A Entertainment,* 992 F.Supp. 1343, 1347-48 (M.D.Fla. 1997). Employment is defined with "striking breath"[3] under the FLSA. *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 328, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). An entity is said to "employ" a person if it "suffers or permits" the person to work. 29 U.S.C. §203(g). In this regard, "courts must determine whether, as a matter of "economic reality," an individual is an employee or an independent contractor. [citations omitted] To that end, courts look not to the common law definition of employment, but rather to whether the putative employee is economically dependent upon the alleged employer.

The evidence was clear that Arise never engaged or contracted directly with any individual, only with corporate entities. Nonetheless, Arise's transparency in its business model and Mr. Abdul-Haqq's working through A & A do not dictate the conclusion that Mr. Abdul-Haqq was an independent contractor.

The question of whether Ayub Abdul-Haqq, or anyone, was an employee or an independent contractor is a function of the economic reality test which includes consideration of six different factors. Applying the specific facts of any one person's experience to the six factors is not, however, the sole measure. As stated in *Scantland v. Jeffry Knight, Inc.,* 721 F.3d 1308, 1311 (11th Cir. 2013):

> Courts have applied various multifactor tests to guide the "economic reality" inquiry. Both parties in the instant appeal rely on the following six factors which many courts have used as guides in applying the economic reality test:
> (1) The nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> (2) The alleged employee's opportunity for profit or loss depending on his managerial skill;
> (3) The alleged employee's investment in equipment or materials required for his task, or his employment of workers;
> (4) Whether the service rendered requires a special skill;
> (5) The degree of permanency and duration of the working relationship;

---

[3] Although the spelling is as quoted above, the Undersigned assumes that it's a case of "darn that auto-correct!" and the actual quote is intended to be "striking breadth."

(6) The extent to which the service rendered is an integral part of the alleged employer's business.

While these factors serve as guides, the overarching focus of the inquiry is economic dependence:

> No one of these considerations can become the final determinant, nor can the collective answers to all of the inquiries produce a resolution which submerges consideration of the dominant factor – economic dependence. The…tests are aids – tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected. It is *dependence* that indicates employee status. Each test must be applied with that ultimate notion in mind. More importantly, the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit.

*Usery*, 527 F.2d at 1311-12 (emphasis in original) (citations omitted). Ultimately, in considering economic dependence, the court focuses on whether an individual is "in business for himself" or is "dependent upon finding employment in the business of others." *Mednick v Albert Enterprises, Inc.*, 508 F.2d 297, 301-02 (5th Cir. 1975).

With the above in mind, this Arbitrator has undertaken a review of the evidence introduced during the Final Hearing.

1) Degree of Arise's Control

Arise has argued that it had no control as to who Claimant chose to hire, no control as to which customers A & A's seven workers chose to service while working under A & A, and no control or input into how each of the seven A & A workers were paid. While Arise did not control who Claimant chose to hire, those hired had to first complete a profile on Arise's website, pass a voice assessment, a background check and pass an initial online class known as CSP101, all of which were administered by Arise. Mr. Abdul-Haqq worked with two different Arise clients. The vast majority of his two and one-half year experience was working with AT&T; he spent approximately two months

working with Intuit. The training materials used for the AT&T certification were AT&T's materials, not Arise authored documents. The calls made by Mr. Abdul-Haqq were all recorded as AT&T required that 100% of their calls be recorded. Although there were multiple layers of people reviewing metrics and Mr. Abdul-Haqq's performance, the people reviewing him were frequently subject to their own independent contractor agreements with Arise.   Mr. James Clinton, however, was an Arise employee.   In his pre-hearing deposition, and when reminded during Final Hearing, Mr. Clinton testified that one of his "job requirements is to ensure that the CSPs meet these metrics." *See transcript, page 480, lines 4 – 12.* As a Senior Performance Compliance Lead (and previously as a Performance Compliance Lead) he supported Quality Assurance Performance Facilitators (hereinafter "QAPFs") reviewing metrics and advising individuals like Claimant when they fell short of expectations.   Mr. Clinton testified to QAPFs listening in on two calls per week for each of the various CSPs under their wing. Mr. Clinton testified to providing templates to Mr. Abdul-Haqq for introductory correspondence for CSPs and being so involved as reviewing and approving said introductory correspondence for grammatical errors prior to its issuance. *See Claimant's Exhibit 9 AriseAH 673 – 676, 671 - 672.* Mr. Clinton testified to sometimes communicating directly with PFs and sometimes communicating with the IBOs instead. Mr. Clinton testified to hosting huddles to assist the QAPFs and provided detailed documentation related to same. *See Claimant's Exhibit 9 AriseAH 664 – 668.* Mr. Clinton exchanged correspondence directly with Mr. Abdul-Haqq about payment problems when invoices were short. *See Claimant's Exhibit 9 AriseAH 677 and 678.* Claimant's Exhibit 9 contains a host of additional documents between Arise Senior Performance Compliance Lead James Clinton and Claimant, Abdul-Haqq. This factor weighs in favor of employee status.

   2) Opportunity for Profit or Loss Depending on Managerial Skill

Case No. 32-160-00496-13

Claimant has argued that he had little opportunity for profit or loss and that his income was earned acting as a CSP, not managing the others working through A & A. According to his testimony, the only money Claimant received for his own benefit from the six working through A & A was reimbursement for money he advanced. No evidence was introduced that Claimant profited from A & A having employees. On the other hand, Claimant's Counsel's question of Robert Padron and his answer thereto (transcript page 410, lines 13 - 19) reflect that workers do have the ability to increase their income based upon their ability to manage their metrics.

> Q. * * * In other words the CSPs who have the highest metrics, get the first pick of hours and they also get the calls routed to them first, so they're more likely to get minutes on the phone with customers in order to get paid?
> A. Top performing independent businesses do have the ability to maximize their revenue potential.

While it seems that the Claimant did not take advantage of the ability to consistently maximize his income, or coach the other people working under his banner to consistently maximize their income in return for a percentage to himself, it does appear that there is an opportunity to profit from the use of managerial skill. This factor weighs in favor of independent contractor status.


3) Investment in Equipment or Materials, or Employment of Workers

Mr. Abdul-Haqq testified to spending approximately $1000.00 on home office equipment and an additional $335.00 on two certification classes. The amount was so significant to Mr. Abdul-Haqq that he needed Mr. Latif's assistance in paying for the training and certification. Nonetheless, Mr. Abdul-Haqq's investment pales in comparison to Arise's investment in its telephony platform. This suggests employee status. Further, the evidence reflects that Mr. Abdul-Haqq's employment of six additional people through A & A was not for personal

10

Case No: 32-160-00496-13

profit but simply as a pass-through for the six to earn income from servicing Arise clients. This fact similarly weighs in favor of employee status.

4) Special Skill

As stated in *Yilmaz v. Mann,* 2014 WL 1018006 (S.D.Fla.), "an independent contractor prepossesses a special skill, while an employee learns one on the job." The evidence at Final Hearing was that Mr. Abdul-Haqq brought no special skills to the table when he began working with Arise. He, like all CSPs, first took CSP101, and then the various client specific certifications in order to work with Arise's clients. This factor weighs in favor of employee status.

5) Degree of Permanency or Duration

Despite the multiple, short-duration SOWs executed between the parties, Mr. Abdul-Haqq worked with Arise's clients for two and one-half years. Further, almost all of this time was spent working under AT&T SOWs. These factors suggest employee status.

6) Extent to Which Service Rendered is Integral Part of Business

Mr. Abdul-Haqq's customer service work for Arise's clients is an integral part of Arise's business. This factor weighs in favor of employee status.

As explained above, the broader economic realities point to employee status, not independent contractor status as between Mr. Abdul-Haqq and Arise. When one then considers the question of "economic dependence," the scale fully tips in favor of employee status. Mr. Abdul-Haqq used the CSP, AT&T and Intuit training and certification he obtained in order to earn his income. He could not have done that without Arise telephony platform. There is no evidence that he could actually use those trainings to obtain other clients for himself. As stated in *Mednick v. Albert Enterprises, Inc.,* 508 F.2d 297, 299 (5th Cir. 1975)

11

Case No. 32-160-00496-13

> The ultimate criteria are to be found in the purposes of the act. * * *
> The statutory coverage is not limited to those (whose work
> activities satisfy the common law "control" test) but rather to those
> who, as a matter of economic reality, are dependent upon the
> business to which they render service.

The evidence clearly reflected that Mr. Abdul-Haqq's / A & A's ability to obtain clients was solely through Arise.

## RESPONDENT'S AFFIRMATIVE DEFENSES

Either for the reasons set forth above, or because no evidence was presented at the Final Hearing to support same, or the defense was mooted between filing and the Final Hearing, the Respondent has failed to prove its affirmative defenses numbered and named as follows: 1) Failure to State a Cause of Action, 2) Failure to State a  Cause of Action for Damages, 3) No Collective/Class/Representative Action, 4) Accord and Satisfaction; Payment, 5) Release, 6) Unclean Hands/In Pari Delicto, 7) Knowing Submission/Consent, 8) Failure to Join an Indispensible Party, 9) IB's Independent Contractor Status, 10) No Respondeat Superior Liability, 11) Not Joint Employer, 12) Breach of Contract, 13) Conduct Reasonable And In Good Faith/Not Willful, 14) Waiver, Discharge and Abandonment, 15) Estoppel, 16) Setoff and Recoupment, 17) Collateral Estoppel, 18) No Punitive or Liquidated Damages, 19) Adequate Remedy at Law, 20) Attorneys' Fees, and 21) Operative Arbitration Rules.

## RESPONDENT'S COUNTERCLAIM FOR UNJUST ENRICHMENT

Respondent alleges that it:

> "reasonably, in good faith, and to its own detriment relied upon the
> representations and promises that Claimant would provide services
> as an employee of A & A, and there would be no employment
> relationship between Arise and Claimant.  Arise so relied in
> structuring its business relationships, in forming and executing its
> business plan, in planning for, preparing, and paying its taxes, and in
> making withholdings and otherwise.  Claimant knowingly and
> purposefully induced Arise to rely upon A & A's promises in this

Case: 25-5495 08/29/2025 DktEntry: 6.1 Page 66 of 69
Case 0:13-cv-62823-WJZ Document 58-5 Entered on FLSD Docket 05/04/2015 Page 13 of 16

Case No. 32-160-00496-13

regard (made by Claimant as A & A's agent and "President"), with the intention that Arise so rely."

The evidence presented at Final Hearing reflects that in fact, Arise required Claimant to work through an independent business organization. As evidenced through both testimony at the Final Hearing and repeated in Arise's post-hearing brief,

> "From the moment an individual chooses to access Arise's website to pursue an Arise project, the business-to-business nature of the relationship is made exceedingly clear. (Tr.533:3-14) To the extent individuals want to provide call center services to large companies by way of leveraging Arise's infrastructure, individuals have the option of *either* (i) working for an existing third-party vendor in the Arise network, or (ii) running one's own third-party vendor and contracting with Arise to provide such services. (Tr. 426:25-427:6.)

The evidence makes clear that it wasn't Arise relying on promises offered by either Mr. Abdul-Haqq or A & A; the fact is that Arise dictated the terms of the parties' relationship, both in the written contracts and the manner in which they operated with each other. Certainly Mr. Abdul-Haqq was an adult who knowingly and intentionally agreed and executed the contracts. Arise was not, however, an innocent party being led down the garden path. Arise's insistence on execution of its own business model precludes it from now seeking the equitable remedy of an unjust enrichment claim.

Accordingly, Respondent has not proven its Counterclaim for Unjust Enrichment.

## RESPONDENT'S COUNTERCLAIM FOR DECLARATORY JUDGMENT

Respondent has not proven its Counterclaim for Declaratory Judgment.

## RESPONDENT'S CROSS-CLAIM FOR INDEMNIFICATION

Respondent's claim for indemnification alleges that:

"Claimant caused A & A to breach its contract with Arise, to which Arise which is an intended third-party beneficiary, by claiming retroactively that he was an employee of Arise. A & A also breached its agreements and representations to Arise."

As reflected above in the *Ferreira v. Network Express, Inc.*, 2007 WL 8097539 (M.D. Fla.) case cited by Respondent, the following quote taken from *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) appears:

> The labels given to the arrangement by the parties involved are not determinative, and "employee status" has been held to be unwaivable. *See, e.g., id.* at 729.

As Respondent points out at the commencement of its Post-Hearing Brief, Claimant testified that he did not believe himself an employee of Arise and never claimed to be an employee of Arise. As cited above however, employee status is unwaivable. Legal recognition of same through this arbitration is not equal to a breach of contract. Therefore, Respondent cannot seek indemnification on the basis that Claimant breached the contract. Accordingly, Respondent has not proven its Cross-Claim for Indemnification.

## RESPONDENT'S CROSS-CLAIM FOR DECLARATORY JUDGMENT

Respondent alleges that A & A has materially breached the MSA. For the reasons set forth above, the Undersigned does not equate a finding that Mr. Abdul-Haqq was an employee of Arise with a breach of contract. I do not find that A & A has materially breached the MSA. Accordingly, the Respondent has not proven its Cross-Claim for Declaratory Judgment.

## AFFIRMATIVE DEFENSES TO THE COUNTERCLAIM AND CROSS-CLAIM

As Respondent has not prevailed upon its Counterclaim or Cross-Claim, the affirmative defenses to same need not be addressed.

Case No: 32-160-00496-13

## DAMAGES

I find that Mr. Abdul-Haqq was an employee of Arise from the time he completed the Arise online profile, passed the Arise voice assessment and the Arise background check. No evidence was introduced that the training and certification which Mr. Abdul-Haqq took over a few months time was similar to that which would be given in vocational school. Without the training and certification, Mr. Abdul-Haqq could not do the work for Arise's clients. Therefore, the training did benefit Respondent. Similarly, without the $1000.00 of equipment, Claimant could not do the work required for Arise's clients. Respondent argues that Claimant did not need two monitors. The testimony regarding the need to have multiple programs open at once when answering customer questions together with the need to satisfy the obligation to limit average times per call suggests that two monitors was not a luxury. Respondent also argues that its Exhibit 63 reflects Claimant only incurring expenses of $157.98. The testimony at Final Hearing from both Claimant and Mr. Latif reflected that Mr. Latif advanced monies for the Claimant, which monies were fully reimbursed by Mr. Abdul-Haqq.

Accordingly, I find that Claimant is entitled to the $1,335.00 in equipment and training costs plus the $5,191.00 in minimum wages for the time spent in training and certification, for a total of $6,526.00. No evidence or argument was presented to counter the statutory entitlement to liquidation. Accordingly, I find and award the total sum of $13,052.00 in favor of Ayub Abdul-Haqq and against Arise Virtual Solutions, Inc.

## CONCLUSION

As the Claimant prevailed in his claim and against the counterclaim and Respondent has failed to prove its cross-claim, the Claimant is the prevailing party in this matter. As the Fair Labor Standards Act provides for prevailing plaintiff attorney's fees, a telephone conference will be scheduled by AAA within

Case No. 32–160–00496–13

two weeks of this Interim Award to discuss the filings to be submitted regarding reasonable attorney's fees and costs.

This Interim Award resolves all issues raised in the Claimant's Demand, Respondent's Answer, Affirmative Defenses, Counterclaim and Cross-Claim, the Claimant's Answer and Affirmative Defenses to the Counterclaim and Cross-Claim.

All prior orders, to the extent not inconsistent with this Interim Award, or superseded by prior order, are hereby ratified, confirmed and made part of this Interim Award.

**DONE AND ORDERED** this 15th day of April, 2015.

_Karen Evans_

KAREN EVANS, ESQUIRE
Arbitrator

16